[No. 56949-5.   En Banc.   January 10, 1991.]

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
IN
KIMBERLY ROGERS, *Individually and as Guardian ad Litem, Plaintiff,* v. MILES LABORATORIES, INC., ET AL, *Defendants.*

*Perey Langley,* by *Ron J. Perey* and *Julia A. Langley,* for plaintiffs.

*Schwabe, Williamson, Wyatt & Lenihan,* by *Bert Markovich; O'Connor, Cohn, Dillon & Barr,* by *Susan Reifel;* and *McDermott, Will & Emery,* by *Geoffrey R.W. Smith,* for defendant Miles Laboratories, Inc.

*George, Hull & Porter, P.S.,* by *Laurie D. Kohli* and *Dechert Price & Rhoads,* by *Richard L. Berkman,* for defendant Baxter Healthcare Corp.

*Robert H. Whaley* and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association, amicus curiae for plaintiffs.

*David M. Jacobi* and *Bruce W. Chadwick* on behalf of the American Red Cross, amicus curiae for defendants.

*Leonard B. Barson* and *Pinckney M. Rohrback* on behalf of Puget Sound Blood Center, amicus curiae for defendants.

CALLOW, C.J.—The District Court for the Western District of Washington, pursuant to RCW 2.60.020, has certified to us the following question:

Whether, in Washington, the doctrine of strict liability is applicable to a for–profit pharmaceutical company for injuries allegedly resulting from the processing and supplying of blood products contaminated with HIV, the virus causing AIDS, where those blood products were derived from plasma obtained from compensated donors?

To answer this question, we consider first (in section II of this opinion) whether RCW 70.54.120 governs this case. By its terms, RCW 70.54.120 does not shield entities, such as defendants, which compensate their donors. The question thus arises whether the statute was intended to *create* strict liability for all entities which do not comply with its terms. We hold that it was not so intended. We recently noted in *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 48, 785 P.2d 815 (1990), that "[t]he purpose behind Washington's blood shield statute is to encourage a readily available supply of blood and blood products." Consistent with that intent, we held in *Howell* that strict liability should not be applied to blood and blood products. *Howell*, at 53. We call to the Legislature's attention the fact that strict liability is not the rule in this state regarding blood products, and suggest that it may wish to reconsider RCW 70.54.120 in that light.

The certified question must, then, be answered based on the common law. In section III, we hold that the applicable rule in Washington for blood and blood products (including factor concentrates) is comment *k* to the Restatement (Second) of Torts § 402A (1965). The questions whether the risk of AIDS was knowable and whether defendants

satisfied their duty to warn are negligence issues to be decided by the federal court.

## I
### FACTS

Jeremy Rogers was born January 16, 1980, with severe hemophilia type B. Persons with this type of hemophilia lack a blood clotting factor known as factor IX. To control the spontaneous hemorrhaging caused by the disease, hemophiliacs such as Jeremy must use factor IX concentrates on an average of once a week throughout their lives.

Factor concentrates are produced from plasma, which factor concentrate manufacturers obtain primarily from commercial plasma centers. Because plasma donation usually takes 1½ to 2 hours—considerably longer than whole blood donation—there would not be enough donors if plasma centers depended on volunteers. Therefore, donors are paid for their time.

Once plasma is obtained from plasma centers by a factor concentrate manufacturer, it is pooled and the clotting factors are removed. The clotting factors are then freeze–dried and packaged in powdered form. The concentrates are available to patients by prescription from their physician. The powder is mixed with sterile water prior to use, and is then administered intravenously.

The production of factor concentrates is regulated and licensed by the Food and Drug Administration's Center for Biologics Evaluation and Research. *See generally* 21 C.F.R. §§ 600–610, 640 (1990). Since April 1985, defendants have employed the test known as the Enzyme–Linked Immunosorbent Assay (ELISA) to detect the presence of antibodies to the HIV virus. However, prior to April 1985, no test was available to defendants in order to test plasma for the HIV virus. Moreover, it is unclear whether it will ever be possible to screen with 100 percent accuracy for the presence of the AIDS virus in blood. *See, e.g.,* Comment, *Blood*

*Donation: A Gift of Life or a Death Sentence?*, 22 Akron L. Rev. 623, 629 (1989).

Factor concentrates possess several major advantages over other available forms of treatment for hemophilia. Factor concentrates are highly purified and thus result in fewer adverse reactions. They make it possible reliably to determine the appropriate level of clotting factor necessary to stop bleeding. Finally, they are easily stored and can be given quickly if prompt treatment is necessary.

For most of his life, Jeremy has used factor IX concentrates manufactured by defendants to treat his hemophilia. In November 1985, Jeremy tested positive for the presence of human immunodeficiency virus (HIV) antibodies. In February 1988, he was diagnosed as suffering from acquired immune deficiency syndrome (AIDS).

Plaintiff Kimberly Rogers filed this action in federal court on behalf of herself and as guardian ad litem for Jeremy against defendants Miles Laboratories and Baxter Healthcare on the tort theories of negligence and strict liability. Plaintiffs allege that Jeremy contracted AIDS as a result of using defendants' products. Defendants moved for partial summary judgment seeking dismissal of those claims brought under strict liability, and the United States District Court granted defendants' motion. Plaintiffs then filed a motion for reconsideration seeking a stay of the court's order and requested certification on the issue of strict liability.

Subsequent to the federal court's dismissal of the strict liability claim, this court issued its holding in *Howell.* The federal court then entered an order to stay the original holding dismissing the strict liability claim and certified the issue to this court. This opinion, therefore, addresses only the issue of whether strict liability applies to defendants in this case. Both parties recognize that the negligence claim is still available to plaintiffs.

## II
### WASHINGTON'S BLOOD SHIELD STATUTE

The first issue to be determined in this case is whether Washington's blood shield statute governs this situation, either expressly or by implication. The statute states:

> The procurement, processing, storage, distribution, administration, or use of whole blood, plasma, blood products and blood derivatives for the purpose of injecting or transfusing the same, or any of them, . . . into the human body is declared to be, for all purposes whatsoever, the rendition of a service by each and every person, firm, or corporation participating therein, and is declared not to be covered by any implied warranty under the Uniform Commercial Code, Title 62A RCW, or otherwise, and no civil liability shall be incurred as a result of any such acts, except in the case of wilful or negligent conduct: *Provided, however,* That this section shall apply only to liability alleged in the contraction of hepatitis, malaria, and acquired immune deficiency disease and shall not apply to any transaction in which the donor receives compensation . . ..

RCW 70.54.120. The express language of the statute clearly provides that where a donor is compensated, statutory immunity from liability does not apply to the transaction. Both parties agree that defendants compensate their donors. Consequently, defendants do not fall within the statute's immunity and the statute does not expressly apply to this case.

Plaintiffs argue that "[i]n enacting RCW 70.54.120, the Washington Legislature intended to apply strict liability to those products which did not meet the statute's provisos." Opening Brief of Appellants, at 48. Thus, plaintiffs argue, because defendants do not qualify for immunity under RCW 70.54.120, defendants should be strictly liable.

██ ██ As defendants note, however, the history of the legislation and its relationship with judicial decisions show that the Legislature thought the common law imposed strict liability on blood products, and saw itself as carving out an exception from this common law policy. The Legislature adopted the first blood immunity statute shortly after decisions in a number of jurisdictions applied strict

liability to suppliers of whole blood. The legislative hearings focused on issues associated with whole blood and did not address the special issues regarding plasma donation and hemophilia. It is not at all clear that the Legislature would have favored strict liability for products such as factor IX concentrate, and we decline to read such an intent into the statute. In *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 49, 785 P.2d 815 (1990), we determined that the Legislature enacted the blood shield statute in order to ensure that there was an "adequate flow of blood products in this state by providing for liability only in cases of negligence". Our holding today is in accord with that goal.

■■ Plaintiffs further argue that in excluding compensated donor transactions from protection under the statute, the Legislature declared a policy that for–profit companies, such as Miles and Baxter, should be strictly liable notwithstanding the common law interpretation of strict liability in this state. We disagree. There is nothing in the statutory language which suggests that the Legislature intended to distinguish between for–profit and nonprofit entities. We cannot derive legislative intent from language which is not in the statute. "When construing a statute, the court must ascertain and give effect to the Legislature's intent. If the statute is unambiguous, the meaning of the statute must be derived solely from the language of the statute." (Citations omitted.) *In re Eaton*, 110 Wn.2d 892, 898, 757 P.2d 961 (1988). Our passing reference in *Howell* to the blood bank's nonprofit status (*Howell,* at 54) was not intended to imply that an entity's for–profit status would make it liable under common law.

Other courts that have interpreted blood shield statutes have declined to attach liability based on an entity's profit or nonprofit status. In a case similar to the one before us, the Second Circuit held that Connecticut's blood shield statute applied to commercial producers and sellers of blood products. *Coffee v. Cutter Biological*, 809 F.2d 191 (2d Cir. 1987). In *Jones v. Miles Labs., Inc.,* 705 F. Supp.

561 (N.D. Ga. 1987), the plaintiffs argued that the blood shield statutes were not intended to apply to commercial laboratories which provide blood products to consumers on a for–profit basis. The District Court for the Northern District of Georgia relied on the Georgia Supreme Court's interpretation of that State's blood shield statute and held that "the clear import of the provision was 'to include not only hospitals, but entities like defendants engaged in providing blood for human use.'" *Jones*, at 562 (citing *McAllister v. American Nat'l Red Cross*, 240 Ga. 246, 240 S.E.2d 247 (1977)).

In sum, we hold that RCW 70.54.120 does not govern this case. We now consider whether strict liability applies under the common law.

## III
### COMMON LAW

In *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 531–32, 452 P.2d 729 (1969), we adopted the theory of strict liability set forth in the Restatement (Second) of Torts § 402A (1965), as it applies to manufacturers. Section 402A, however, is not without exception. In *Terhune v. A.H. Robins Co.*, 90 Wn.2d 9, 577 P.2d 975 (1978), this court held that the high risks connected with the use of an intrauterine device did not subject the manufacturer to strict liability if the product was properly prepared and proper warnings were given to the prescribing physician. *Terhune*, at 16–17. In so doing, we adopted comment *k* to § 402A, which states:

> *k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the

like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Restatement (Second) of Torts § 402A comment *k* (1965).

Plaintiffs argue that "comment k is inapplicable to adulterated blood products contaminated with an unknown virus". Opening Brief of Appellants, at 48. They cite *Cunningham v. MacNeal Mem. Hosp.*, 47 Ill. 2d 443, 266 N.E.2d 897 (1970) and *Community Blood Bank, Inc. v. Russell*, 196 So. 2d 115 (Fla. 1967) for the proposition that comment *k* should not exempt blood products from strict liability. This court recently noted that *Cunningham* is contrary to Washington precedent regarding the application of strict liability to blood and blood products. *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 52, 785 P.2d 815 (1990). Moreover, the Illinois Legislature subsequently reversed *Cunningham* through legislation. *See Glass v. Ingalls Mem. Hosp.*, 32 Ill. App. 3d 237, 336 N.E.2d 495 (1975).

Justice Traynor clearly saw comment *k* as applying to blood and blood derivatives. He discussed the problem of blood infected with hepatitis as follows:

Definition of a defect in terms of deviation from the norm, however, breaks down in some cases, as when it is over–inclusive. On guard against such a possibility, the *Restatement of Torts* would impose no strict liability for what are classified as "unavoidably unsafe products." A classic example is blood. . . .

Far from restricting immunity from strict liability such as blood banks enjoy, the *Restatement* would extend it even to

> manufacturers of many drugs of uniform quality, if their use-fulness appears to outweigh the known dangers that attend their use.

(Footnotes omitted.) Traynor, *The Ways and Meanings of Defective Products and Strict Liability,* 32 Tenn. L. Rev. 363, 367–68 (1965).

Comment *k* justifies an exception from strict liability by focusing on the product and its relative value to society, rather than on the manufacturer's position in the stream of commerce. Some products are necessary regardless of the risks involved to the user. The alternative would be that a product, essential to sustain the life of some individuals, would not be available—thus resulting in a greater harm to the individual than that risked through use of the product. Blood and blood products fall into this category. In *Howell,* after a detailed examination of this State's law regarding blood and blood products, we unanimously concluded that "[t]he purposes of strict liability are not furthered when applied to blood and blood products". *Howell,* at 53. We noted three policy reasons against subjecting blood and blood products to attack under strict liability:

> First, the societal need to ensure an affordable, adequate blood supply furnishes a persuasive reason for distinguishing between victims of defective blood and victims of other defective products. Second, strict liability cannot provide an incentive to promote all possible accident prevention at a time when there was no possible means of screening the blood for HIV. Third, while the producers may be in a better position to spread the costs, it is not in society's best interest to have the price of a transfusion reflect its true costs.

*Howell,* at 53–54. These reasons apply equally to the facts before us. Therefore, we hold that strict liability does not apply to blood and blood products, including factor con-centrates.

In an attempt to avoid the foregoing analysis, plaintiffs argue that the risk–bearing economic theory should be applied to the present case. This theory assumes "that the manufacturer can shift the costs of accidents to purchasers for use by charging higher prices". W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 98 (5th

ed. 1984). Plaintiffs suggest that defendants are in the best position to ascertain and control the risks associated with their products and that therefore strict liability should be applied. We disagree.

Allocating the costs of liability to manufacturers of products is a legitimate policy goal. However, when applied to the present set of circumstances, the theory fails to achieve its desired results. Only about 3,000 people in the United States have hemophilia type B. Of those, approximately 1,800 have "severe" hemophilia and require treatment with factor IX concentrates on the average of once a week. It would be unrealistic to expect such a small number of hemophiliacs to be able efficiently to spread the costs associated with liability insurance. For example, *Brown v. Superior Court,* 44 Cal. 3d 1049, 1064, 751 P.2d 470, 245 Cal. Rptr. 412 (1988) noted:

> One producer of diphtheria–tetanus–pertussis vaccine withdrew from the market, giving as its reason "extreme liability exposure, cost of litigation and the difficulty of continuing to obtain adequate insurance." There are only two manufacturers of the vaccine remaining in the market, and the cost of each dose rose a hundredfold from 11 cents in 1982 to $11.40 in 1986, $8 of which was for an insurance reserve.

(Citation omitted.) The end result for factor IX would be that the product would not be available to those who need it.

The same economic reasoning was used by the United States District Court for Minnesota when that court stated:

> Hemophiliacs, like Doe, depend on the availability of [factor concentrates] which ha[ve] lengthened and improved the quality of their lives. Because the market for these products is small, their availability would be threatened if the cost of the inherent risk of HIV infection were imposed on the manufacturer. Therefore, despite the devastating consequences resulting from the transmission of HIV through products like [factor concentrates], virtually every court that has considered the question has interpreted blood shield statutes to apply to the commercial processors of antihemophilic factors [in order to exempt processors from strict liability].

(Footnote omitted.) *J.D. Doe v. Travenol Labs., Inc.,* 698 F. Supp. 780, 784 (D. Minn. 1988).

The same issue was addressed in *Miles Labs., Inc. v. Jane Doe,* 315 Md. 704, 556 A.2d 1107 (1989), in which the court reasoned:

> The singular medical utility of blood and blood products, together with the compelling necessity for their use when medically indicated, ordinarily outweighs the known risk in all blood transfusions that these products may contain some impurities. Strict tort liability principles are not applicable under Comment k when, at the time of distribution of such products, they contained a then unknown and unknowable infectious agent undetectable by any available scientific test. In such circumstances, the seller would not under then applicable common law precepts, including the substance of Comment k, be held strictly accountable in tort because the product was not free of the unknown contaminant which caused injury to the recipient; manifestly, the seller was not in a better position than the victim, or the victim's physician, to take precautions against the unknowable defect in the product.

*Miles Labs., Inc. v. Jane Doe, supra* at 732–33. We find this reasoning persuasive.

Numerous other jurisdictions are in accord with our decision not to apply the theory of strict liability to suppliers of blood and manufacturers of blood products. *See, e.g., Fogo v. Cutter Labs., Inc.,* 68 Cal. App. 3d 744, 137 Cal. Rptr. 417 (1977) (manufacturer relieved of strict liability because the hepatitis virus could not be discovered or removed from factor IX concentrate); *Fisher v. Sibley Mem. Hosp.,* 403 A.2d 1130 (D.C. 1979) (public policy and comment *k* relieved hospital of strict liability for furnishing blood plasma infected with hepatitis); *McMichael v. American Red Cross,* 532 S.W.2d 7, 9 (Ky. 1975) (since "there were no methods available . . . by which hepatitis virus could effectively be excluded from blood", the blood was unavoidably unsafe under comment *k* and not unreasonably dangerous); *Brody v. Overlook Hosp.,* 127 N.J. Super. 331, 317 A.2d 392 (1974) (regardless of sale/service distinction, policy reasons warrant classifying blood as "unavoidably unsafe" with regard to hepatitis; therefore no strict liability), *aff'd,* 66 N.J. 448, 332 A.2d 596 (1975); *Moore v. Underwood Mem. Hosp.,* 147 N.J. Super. 252, 371 A.2d 105 (1977) (following *Brody*); *see generally* Annot., *Products*

*Liability: What Is an "Unavoidably Unsafe" Product,* 70 A.L.R.4th 16, §§ 38[a], 39[a] (1989).

Comment *k* requires that a manufacturer warn users of possible risks involved with its products in order to be free from liability. However, comment *k* does not define "proper warning". In *Terhune v. A.H. Robins Co.,* 90 Wn.2d 9, 577 P.2d 975 (1978), we said that "it has become a well-established rule that in [cases involving prescription drugs], the duty of the manufacturer to warn of dangers involved in use of a product is satisfied if he gives adequate warning to the physician who prescribes it." *Terhune,* at 13. This rule was recently reiterated in *McKee v. American Home Prods. Corp.,* 113 Wn.2d 701, 709, 782 P.2d 1045 (1989). It might be argued that, in order fully to resolve the question whether strict liability applies, we must also resolve whether defendants met their duty to warn under comment *k*. The argument would be that if defendants did not qualify for the comment *k* exception, then the overall rule— strict liability—would apply. However, as the California Supreme Court recently noted:

> there is a general consensus that, although [comment *k*] purports to explain the strict liability doctrine, in fact the principle it states is based on negligence. That is, comment k would impose liability on a drug manufacturer only if it failed to warn of a defect of which it either knew or should have known. This concept focuses not on a deficiency in the product—the hallmark of strict liability—but on the fault of the producer in failing to warn of dangers inherent in the use of its product that were either known or knowable—an idea which "rings of negligence," in the words of *Cronin [v. J.B.E. Olson Corp.],* 8 Cal.3d 121, 132 [501 P.2d 1153, 104 Cal. Rptr. 433 (1972)].

(Footnote and citations omitted.) *Brown,* 44 Cal. 3d at 1059. We agree with this analysis. If the manufacturer of an unavoidably unsafe product fails to provide an adequate warning, it has been negligent—but it is liable in negligence and not in strict liability. Therefore, as plaintiffs' negligence claims are still before the federal court, any issues regarding defendants' duty to warn should be resolved by that court.

208

We hold that (1) Washington's blood shield statute does not govern this case; (2) the proper tort standard for manufacturers of blood and blood products is that of negligence, not strict liability; and (3) the applicable law is set forth in comment *k* to the Restatement (Second) of Torts § 402A. The plaintiffs have a negligence cause of action which is still before the Federal District Court.

UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, DURHAM, and SMITH, JJ., concur.