JKB, SR., and VB, personally and as surviving parents and natural guardians of JKB, Jr., Deceased, Appellants,

v.

ARMOUR PHARMACEUTICAL COMPANY a Delaware corporation, Cutter Laboratories, Division of Miles, Inc., a Delaware corporation, Baxter Healthcare Corporation, f/k/a Hyland Therapeutics, Division of Travenol Laboratories, Inc., a Delaware corporation, and Alpha Therapeutics Corporation, a California corporation, Appellees.

No. 49A02–9506–CV–341.

Court of Appeals of Indiana.

Jan. 24, 1996.

Rehearing Denied April 1, 1996.

Henry J. Price, Larry R. Jackson, Price & Barker, Indianapolis, for Appellants.

James S. Stephenson, Stephenson & Kurnik, Indianapolis, David I. Bell, Daphne B. Subar, Knapp Petersen & Clarke, Glendale, California, Robert G. Weddle, Indianapolis, Charles P. Goodell, Jr., Thomas J. Cullen, Jr., Goodell Devries Leech & Gray, Baltimore, Maryland, Bonnie L. Gallivan, Kevin R. Knight, Ice Miller Donadio & Ryan, Indianapolis, R. Robert Stommel, Lewis & Wagner, Indianapolis, Lory A. Barsdate, Douglas F. Fuson, Sara J. Gourley, David E. Manning, Sidley & Austin, Chicago, Illinois, Eve Strauss West, Norbert F. Bergholtz, Fred T. Magaziner, Dechert Price & Rhoads, Philadelphia, Pennsylvania, for Appellees.

## OPINION

ROBERTSON, Judge.

JKB, Sr., and VB, personally and as surviving parents of JKB, Jr., Deceased [JKB], appeal the summary judgment entered against them on the product liability claim (strict liability in tort) in their lawsuit against Armour Pharmaceutical Company, Cutter Laboratories, Baxter Healthcare Corporation, and Alpha Therapeutics Corporation [Pharmaceutical Companies]. JKB raises several related issues with multiple subparts. We restate and consolidate JKB's issues as follows:

> whether pharmaceutical companies are insulated from product liability claims arising out of the sale of the blood products under Indiana's blood shield statute.

We reverse.

### FACTS

The dispositive facts are not disputed. JKB was born on February 21, 1977. He had hemophilia. From 1980 through 1986, JKB received blood clotting factor products, known as Factor VIII, produced and sold by the pharmaceutical companies to treat his hemophilia. Unfortunately, the products used by JKB had been contaminated by the virus that causes AIDS. JKB contracted AIDS from the blood products and died on December 31, 1991. Medical and technological advances since the advent of AIDS have now made such blood products safe.

The Factor VIII blood products produced by the pharmaceutical companies are derived from human blood and are produced by a process called "plasmapheresis." Blood is taken from a donor and spun in a centrifuge to separate the plasma from the red blood cells and the red blood cells are then returned to the donor. Because these extra steps are involved, giving blood for plasmapheresis is much more time consuming than the donation of whole blood and donors must be compensated accordingly. The plasma is

then pooled with plasma from other donors and various chemical and physical processes are employed to extract the Factor VIII clotting factor from the plasma. Factor VIII is then concentrated, sterile filtered, placed into vials, and freeze-dried. It is sold, by prescription, in this freeze-dried, powdered form.

The pharmaceutical companies filed a motion to dismiss (which was later converted into a motion for summary judgment) with respect to the count in JKB's complaint alleging strict liability in tort arguing that, under Indiana's blood shield statute, the provision of Factor VIII constituted a rendition of a service and not the sale of a product and thus could not give rise to a product liability action. The pharmaceutical companies did not challenge the remaining counts in JKB's complaint which include allegations of negligent manufacture and the negligent failure to warn of the dangers associated with the blood products.

The trial court granted the pharmaceutical companies' motion. This discretionary, interlocutory appeal ensued.

### DECISION

Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *Great Lakes Chemical Corp. v. International Surplus Lines Insurance Co.* (1994), Ind.App., 638 N.E.2d 847, 849. In reviewing a motion for summary judgment, this court must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *Cloverleaf Apartments, Inc. v. Town of Eaton* (1994), Ind.App., 641 N.E.2d 665, 667. A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating the trial court erred. *Rosi v. Business Furniture Corp.* (1993), Ind., 615 N.E.2d 431, 434. Nevertheless, this court must carefully scrutinize the trial court's decision to ensure that the losing party is not improperly denied his day in court. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 190.

The Blood Shield Statute, Ind.Code 16–41–12–11, reads as follows:

> (a) The:
>
> (1) procurement, processing, distribution, or use of whole blood, plasma, blood products, blood derivatives, or other human tissue, such as corneas, bones, or organs, by a *bank, storage facility, or hospital;*
> . . .
>
> is the rendition of a service and not the sale of a product. Such services do not give rise to an implied warranty of merchantability or fitness for a particular purpose, nor do the services give rise to strict liability in tort.

(Emphasis added). Under this chapter, the terms "bank," "storage facility," and "hospital" have the meaning set forth in Ind.Code 29–2–16–1. I.C. 16–41–12–2, 3, 9. Indiana Code 29–2–16–1, which sets out these definitions reads in pertinent part as follows:

> (a) "Bank or storage facility" means a facility licensed, accredited or approved under the laws of any state for storage of human bodies or parts thereof.
> * * *
>
> (d) "Hospital" means a hospital licensed, accredited or approved under the laws of any state [including] a hospital operated by the United States government, a state or a subdivision thereof, although not required to be licensed under state laws.
>
> * * * * * *
>
> (h) "State" includes any state, district, commonwealth, territory, insular possession and any other area subject to the legislative authority of the United States of America.

The cause of action for strict liability in tort arose under common law. *See Cornette v. Searjeant Metal Products, Inc.* (1970), 147 Ind.App. 46, 258 N.E.2d 652, 656. Thus, the blood shield statute, which limits the ability to bring such a cause of action, is in derogation of the common law. As such, two rules of statutory construction apply:

> First, a statute . . . which is in derogation of the common law must be strictly construed against limitations on a claimant's right to bring suit. Secondly, when the legislature enacts a statute in derogation of

the common law, this Court presumes that the legislature is aware of the common law, and does not intend to make any change therein beyond what it declares either in express terms or by unmistakable implication.

*Tittle v. Mahan* (1991), Ind., 582 N.E.2d 796, 800 (citations omitted).

■■■ When interpreting a statute, the foremost objective is to determine and effect legislative intent. *Spaulding v. International Bakers Services, Inc.* (1990), Ind., 550 N.E.2d 307, 309. Statutes must be construed to give effect to legislative intent, and courts must give deference to such intent whenever possible. *Indiana State Police Department v. Turner* (1991), Ind.App., 577 N.E.2d 598, 601, *trans. denied.* Thus, courts must consider the goals of the statute and the reasons and policy underlying the statute's enactment. *Id.* Courts are to examine and interpret a statute as a whole, giving words their common and ordinary meaning, and not overemphasize a strict, literal, or selective reading of individual words. *Spaulding,* 550 N.E.2d at 309. Words and phrases are taken in their plain, ordinary, and usual meaning unless a different purpose is manifested by the statute. *State ex rel. Pearson v. Brown* (1989), Ind.App., 537 N.E.2d 534, 535, *trans. denied.* Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute. *Spaulding,* 550 N.E.2d at 309. The specific inclusion of one entity usually precludes the implication of another entity's inclusion in the same statutory provision. *Health and Hospital Corporation v. Marion County* (1984), Ind.App., 470 N.E.2d 1348, 1356, *trans. denied.* When certain items or words are specified or enumerated in a statute, then, by implication, other items or words not so specified or enumerated are excluded. *Id.* at 1355.

Blood shield statutes, effected in nearly every state, have the purpose of ensuring an adequate supply of life-saving and essential blood products. *Rogers v. Miles Laboratories, Inc.* (1991), 116 Wash.2d 195, 802 P.2d 1346, 1349; *Zichichi v. Middlesex Memorial Hospital* (1987), 204 Conn. 399,

528 A.2d 805, 810. To achieve this end, such statutes generally provide for liability only in cases of negligence. *Id.* As the *Zichichi* court noted:

"[t]o require providers to serve as insurers of the safety of these materials might impose such an overwhelming burden as to discourage the gathering and distribution of blood."

528 A.2d at 810.

■■■ In the present case, the pharmaceutical companies sought (and obtained) refuge under Indiana's blood shield statute by arguing that they each constituted a "storage facility" as protected under I.C. 16–41–12–11(a)(1). The pharmaceutical companies argued further that they satisfied the requirement under I.C. 29–2–16–1(a) that they be licensed "under the laws of any state for storage of human bodies or parts thereof" by virtue of their licenses issued by the United States Federal Drug Administration [FDA] for the manufacture of blood products because their licenses authorize them to store plasma and other blood products.

However, under a strict construction analysis, we simply cannot conclude that our legislature intended to include a pharmaceutical company, which commercially produces blood products for mass distribution, as an entity within the same class described as an organ or a blood "[b]ank or storage facility." The manufacture and distribution of blood products by pharmaceutical companies is better characterized as the sale of a product rather than the provision of a service. *See Miles Laboratories Inc. v. Doe* (1989), 315 Md. 704, 556 A.2d 1107, 1117. It is quite unlikely that our legislature intended to include pharmaceutical companies in its definition of "[b]ank or storage facility" simply because the manufacture or production of blood products incidentally involves their storage.

Pharmaceutical companies are not included in the class of entities protected under the blood shield statute either expressly or by unmistakable implication. Had our legislature intended to include pharmaceutical companies under the statute scrutinized, it could have done so expressly. For example, our legislature expressly listed "pharmaceutical

companies" along with "blood centers" when it named the types of facilities subject to regulation under I.C. 16–41–16–1 for the disposal of medical waste.

As the blood shield statute does not insulate pharmaceutical companies from product liability under the present circumstances, the trial court's entry of summary judgment against JKB on this issue was erroneous. Therefore, we must reverse.

Judgment reversed.

BAKER, J., concurs.

CHEZEM, J., concurs in result with separate opinion.

CHEZEM, Judge, concurring in result.

I concur in result. While I agree that summary judgment should not have been granted against JKB, I arrive at this conclusion for reasons different than the majority's.

The pharmaceutical companies argue that they are protected by the Blood Shield Statute, Ind.Code § 16–41–12–11, because they fall within the definition of a "storage facility." "As used in the Blood Shield Statute, 'storage facility' has the meaning set forth in IC 29–2–16–1." Ind.Code § 16–41–12–9. According to Ind.Code § 29–2–16–1(a), storage facility means "a facility licensed, accredited or approved under the laws of any state for storage of human bodies or parts thereof." The pharmaceutical companies assert that their FDA licenses qualify them as being licensed for storage "under the laws of any state." I do not believe that the legislature was referring to an FDA license when it drafted that language.

Indiana Code Section 16–41–12–16 outlines what it means to be licensed in Indiana, and, I believe, provides guidance for the resolution of the present issue. That section states:

It is unlawful to operate a blood center in Indiana without a license issued by the state department under this chapter. *A blood center that applies for a license in Indiana must also be licensed or appropriately registered by the federal Food and Drug Administration* and remain in com-

pliance with all applicable federal regulations.

16–41–12–16(a) (emphasis added). Therefore, merely having an FDA license or registration is not enough to operate a blood center in Indiana; a blood center must have a registration or license from the FDA *and* a license issued by the State of Indiana. As used in Ind.Code § 16–41–12, the term "blood center" expressly includes a "blood storage facility." Ind.Code § 16–41–12–3. Accordingly, it seems reasonable that an out of state blood storage facility which distributes blood products in Indiana would need to be licensed for storage by *a state* as well as be licensed or registered by the FDA in order to fall within the parameters of a "storage facility" as used in the Blood Shield Statute.

The appellees have not designated any evidence which would indicate that they are licensed to store blood, blood products, etc., in Indiana, or in any other state. They have only produced the licenses from the FDA. These are not enough to bring them within the protection of the Blood Shield Statute.