[No. 22140-7-III. Division Three. October 26, 2004.]

THOMAS M. HIGGINS, ET AL., *Respondents*, v. INTEX RECREATION CORP., *Appellant*, DAN FALKNER, *Respondent*.

---

[30] *State v. Doogan*, 82 Wn. App. 185, 188, 917 P.2d 155 (1996) (citing *State v. Bray*, 52 Wn. App. 30, 34, 756 P.2d 1332 (1988)).

822

*Pamela A. Okano* (of *Reed McClure*), for appellant.

*Roger A. Felice; Nicholas P. Scarpelli, Jr., Timothy J. Parker, Kenneth S. Kagan,* and *Jason W. Anderson* (of *Carney Badley Spellman, P.S.*); and *Ross P. White* (of *Witherspoon, Kelley, Davenport & Toole, P.S.*), for respondents.

SWEENEY, A.C.J. — This is a suit for personal injury damages based on product liability. To make a case, the plaintiffs had to show that the product was not reasonably safe as designed. Ultimately our disposition here turns on whether the plaintiffs' showing at trial was sufficient to send the question of the product's (a snow tube) safety to the jury. The plaintiffs submit that the snow tube went too fast, had no means for the rider to control it, and turned the rider into a fixed backward position. The product distributor responds essentially that this is what the tube was designed to do and therefore the product performed as designed and was not defective, as a matter of law. We conclude that the plaintiffs' showing was sufficient to submit the question whether the snow tube was *not* reasonably safe as designed to the jury. And we therefore affirm the judgment for the plaintiffs.

## FACTS

Intex Recreation Corporation distributes a vinyl, inflatable tube called Extreme Sno-Tube II. Dan Falkner bought one and used it sledding that same day. He described his first run with the tube as fast. And the tube took him farther than other sliding devices he had used. During Mr. Falkner's second run, the tube rotated him backward about one-quarter to one-third of the way down the hill. A group of parents, including Tom Higgins, stood near the bottom of the hill. Mr. Higgins heard a noise, looked, and saw seven-

year-old Kyle Potter walking in the path of Mr. Falkner's speeding Sno-Tube:

> The size of the person on the sled and the little boy walking, I could see that their heads were going to hit so I took off as fast as I could and I grabbed him and, as I grabbed him to lift him, the tube, I misjudged the speed of the tube. It was going a lot faster than I thought, and it clipped me in the ankle, and I threw Kyle and my feet went straight up into the air and I landed on my forehead and snapped my head back.

Report of Proceedings (RP) at 1650-51. The impact severed Mr. Higgins's spinal cord and left him a quadriplegic.

Mr. Higgins and his family sued Intex Recreation Corporation for damages based on negligence and strict liability. He also sued Dan Falkner, Curt Potter, and Kyle Potter for negligence. Curt Potter is Kyle's father; he was present at the hill at the time of the accident.

Much of the testimony at trial focused on the design of the Sno-Tube and specifically its speed and the lack of any way to direct it. Before Mr. Higgins's accident, Intex had prepared a hazard inventory. It evaluated hazards for each Intex product, and classified them by likelihood of the hazard and severity of any injury. Intex ranked the Sno-Tube 1-A, that is, most likely to involve collisions with severe injuries resulting. Intex recognized that a problem with the Sno-Tube is that "[u]sers may believe that these products have a steering mechanism and [may] misjudge their ability to control them." RP at 625. Speed is a function of the Sno-Tube. Intex's Sno-Boggan goes just as fast but does not rotate. The only way to stop the Sno-Tube is to bail out. Competitors sell inflatable sledding devices with ridges that assist the rider in directing them. But the general position of Intex was that if the Sno-Tube did not go fast and rotate it would not be a Sno-Tube.

The plaintiffs put on ample expert testimony that Sno-Tubes in general carry a higher risk of injury because the rider can easily wind up going over 30 miles per hour downhill backwards with no way to direct or stop the tube.

Those same experts concluded that ridges on the bottom of the Sno-Tube would have stopped the rotation and assisted the rider in directing it.

Intex moved for directed verdict at the close of the plaintiffs' case and for judgment as a matter of law following the jury's verdict. It predicated both motions on its view that the plaintiffs had not presented sufficient evidence of a design defect—essentially the Sno-Tube performed as designed. The court denied both motions.

A jury found Dan Falkner not negligent. It found Curt Potter negligent and responsible for 60 percent of the plaintiffs' damages. It found Kyle Potter negligent and responsible for 5 percent. And it found the Sno-Tube was not reasonably safe as designed and held Intex strictly liable for 35 percent of the damages.

Intex appeals.

## DISCUSSION

PRODUCT LIABILITY—DESIGN DEFECT

*Washington's Product Liability Act—RCW 7.72.030*

(a) A product is not reasonably safe as designed if, at the time of manufacture, the *likelihood that the product would cause the claimant's harm* or similar harms, *and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product . . . .*

. . . .

(3) In determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was *unsafe to an extent beyond that which would be contemplated by the ordinary consumer.*

RCW 7.72.030(1)(a), (3) (emphasis added). There are two tests then for determining whether a product is defective.

■■ The *risk-utility test* requires a showing that the likelihood and seriousness of a harm outweigh the burden

on the manufacturer to design a product that would have prevented that harm *and* would not have impaired the product's usefulness. RCW 7.72.030(1)(a). The *consumer-expectation test* requires a showing that the product is more dangerous than the ordinary consumer would expect. RCW 7.72.030(3); *see Pagnotta v. Beall Trailers of Or., Inc.*, 99 Wn. App. 28, 36, 991 P.2d 728 (2000). This test focuses on the reasonable expectation of the consumer. *Soproni v. Polygon Apartment Partners*, 137 Wn.2d 319, 326-27, 971 P.2d 500 (1999). A number of factors influence this determination including the intrinsic nature of the product, its relative cost, the severity of the potential harm from the claimed defect, and the cost and feasibility of minimizing the risk. *Seattle-First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 154, 542 P.2d 774 (1975).

Intex argues that the Sno-Tube did exactly what it was designed to do and exactly what consumers expected it to do—go fast and rotate. So any design that eliminated the tube's ability to rotate and go fast eliminated the characteristics that differentiate the Sno-Tube from other sledding products. Intex also argues that sledding—on *any* device—carries the risk of severe injury. And the reasonable consumer understands or should understand this.

 We are passing upon the court's denial of a directed verdict and its refusal to grant judgment as a matter of law. Both decisions turn on whether we find substantial evidence in this record to support the jury's finding that this product is unreasonably dangerous under the two tests set out in the statute. *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980).

*Risk-Utility Test*

We look first at the arguments Intex advances under the risk-utility test. Intex argues that under the risk-utility test, the Sno-Tube, as a matter of law, was reasonably safe as designed. In its view, there is no feasible alternative design with this function—a function sought by the con-

sumer. *See Ruiz-Guzman v. Amvac Chem. Corp.*, 141 Wn.2d 493, 7 P.3d 795 (2000).

■ A plaintiff can satisfy its burden of proving an alternative design by showing that another product "more safely serve[s] the same function as the challenged product." *Id.* at 504-05. There is evidence in this record from which a jury could conclude that the placement of ribs or ridges on the bottom of the Sno-Tube, like those used on Intex's Sno-Boggan, would keep the rider facing downhill. The rider could then see obstacles and direct the tube. All this could be done without significantly sacrificing speed. This is enough, under *Ruiz-Guzman*, to prove an alternative safer design.

■ Intex argues essentially that some products are unavoidably and inherently unsafe. And while that may be true, *Ruiz-Guzman* suggests some guidelines for evaluating when that is an excuse: "[T]he . . . manufacturer of a challenged product would have to demonstrate that an inherently dangerous product is also 'necessary regardless of the risks involved to the user.'" *Id.* at 510 (quoting *Rogers v. Miles Labs., Inc.*, 116 Wn.2d 195, 204, 802 P.2d 1346 (1991)). The focus is on the product and its relative value to society. *Id.*

Now, the ride down a snow-covered hill backward at 30 miles per hour may be a thrill. But it has very little social value when compared to the risk of severe injury. We do not think the Sno-Tube is a product that is "'necessary regardless of the risks involved to the user.'" *Id.* (quoting *Rogers*, 116 Wn.2d at 204).

Intex relies on our case of *Thongchoom v. Graco Children's Products, Inc.*, for the proposition that a design change would result in a product that does not do what this one does and, therefore, it would be a fundamentally different product. *Thongchoom v. Graco Children's Prods., Inc.*, 117 Wn. App. 299, 71 P.3d 214 (2003), *review denied*, 151 Wn.2d 1002 (2004). *Thongchoom* is distinguishable. The function of the product there (a baby walker) was baby mobility. And the only proposed alternative eliminated that

essential function—mobility. The product could not be described as inherently unsafe. It simply enabled a baby to move about.

The evidence here was of the obvious—speeding backward at 30 miles per hour down a crowded snow-covered hill is not safe, at least according to this jury. Again, reasonable inferences here are that the user cannot watch for others in his or her path. And, bystanders cannot always move fast enough to avoid the tube. There was ample evidence that an alternative design would permit the user to see what is in his or her path and avoid collisions by either bailing out or by using some minimal steering.

We find ample evidence to support this verdict, applying the risk-utility test.

*Consumer-Expectation Test*

We next take up Intex's assertion that the tube was not "unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.72.030(3). Again, we find ample evidence in this record to support the plaintiffs' assertion to the contrary.

Intex's Vice President, William Frank Smith, testified that Sno-Tube users "may believe that these products have a steering mechanism and [may] misjudge their ability to control them." RP at 625. And a reasonable jury could easily infer that the average consumer may expect the Sno-Tube to rotate. But he or she might not expect that it would continue in a backward position.

The trier of fact was instructed on and was entitled to consider a number of factors:

> "In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and *the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product* or the nature of the claimed defect *may make other factors relevant to the issue.*"

*Couch v. Mine Safety Appliances Co.*, 107 Wn.2d 232, 238, 728 P.2d 585 (1986) (emphasis added) (quoting *Tabert*, 86 Wn.2d at 154); Instruction 19 (Clerk's Papers (CP) at 3287).

Here, the Sno-Tube is inexpensive. But so is Intex's Sno-Boggan. And the Sno-Boggan provides a fast ride but not a blind high-speed ride. A jury could then find that a reasonable consumer would expect that a snow sliding product would not put him or her in a backward, high-speed slide.

We find ample evidence in favor of the plaintiffs applying the consumer-expectation test.

ADMISSION OF INTEX SAFETY RECORDS/KNOWLEDGE INSTRUCTION

The plaintiffs originally claimed both strict liability and negligence. The essence of Intex's argument is that its knowledge of prior suits, claims, or notices is irrelevant to the plaintiffs' design defect claim. The focus of its written briefs, however, is a bit different than the focus of its oral argument.

In the written briefs, Intex focused primarily on the refusal of the trial judge to exclude evidence of its knowledge and conduct as to prior claims and post-accident actions or inactions. This focus included the trial judge's refusal to grant a mistrial, based on the introduction of this evidence, after the plaintiffs dropped their negligence claims. Intex supplemented its briefs at the time of oral argument here. The new brief and counsel's oral argument shift the focus away from assigning error to the court's ruling on the admission of this evidence and the subsequent motion for mistrial to the court's refusal to give Intex's proposed instruction 20. We will address each argument.

*Evidence Rulings*

■ ■ Intex objected to a number of exhibits, including evidence of prior suits and claims; company correspondence and internal memoranda regarding suits and claims; and company conduct regarding product warnings, product testing, and product safety. Some of these showed that colli-

sions were likely to occur causing significant injuries, and users might believe that the product has a steering mechanism and misjudge their ability to control it. They included specific recommendations for warnings: "DEVELOPS HIGH SPEED UNDER CERTAIN SNOW CONDITIONS"; "PRODUCT HAS NO BRAKES AND NO STEERING"; and "FOLLOW THESE RULES TO AVOID PARALYSIS OR OTHER SERIOUS INJURY." Ex. 41. And they included a specific concern which resulted in the following warning being printed on the tube:

> WARNING: USE ONLY UNDER COMPETENT SUPERVISION. NOT A LIFE SAVING DEVICE. NEVER ALLOW DIVING INTO THIS PRODUCT. NEVER TOW FROM ANY VEHICLE. NEVER LEAVE IN OR NEAR THE WATER WHEN NOT IN USE. ALWAYS AVOID OBSTACLES AND SUDDEN DROPS. DEVELOPS HIGH SPEED UNDER CERTAIN SNOW CONDITIONS. PRODUCT HAS NO BRAKES AND NO STEERING. FOLLOW THESE RULES TO AVOID PARALYSIS OR OTHER SERIOUS INJURY.

Ex. 43.

An Intex employee acknowledged that there have been "many" incidents of head and spinal cord injuries or death associated with the Sno-Tube. Intex nonetheless did not change the design. The exhibits Intex objected to included a 1996 report of Intex's product safety committee: "the recent wave of media attention given to sledding accidents . . . . [I]nflatable snow tubes were specifically cited as a major contributor to the injuries suffered in the accidents due to their speed and lack of brakes and steering." Ex. 45.

Intex argues that this evidence is not relevant to the plaintiffs' claim of design defect. We review this claim—the admission of evidence—for abuse of discretion. *State v. Luvene*, 127 Wn.2d 690, 707, 903 P.2d 960 (1995).

Here, proof of strict liability for a design defect included much the same evidence necessary to show negligence. *Falk v. Keene Corp.*, 113 Wn.2d 645, 650, 782 P.2d 974 (1989). A product manufacturer is subject to strict liability for harm

caused "by the negligence of the manufacturer in that the product was not reasonably safe as designed." RCW 7.72.030(1). Ordinary negligence is not the statutory standard. But the tests set out in the statute are akin to negligence, *Falk*, 113 Wn.2d at 652, particularly the risk-utility test. That test balances the likelihood and severity of harm against the burden on Intex of designing a safe tube. Reports of injuries then (as early as 1993) to users of this tube and Intex's response—changes in the warnings—relate to the risk side of the risk-utility test.

■ The trial judge did not abuse her considerable discretion by admitting this evidence and refusing to grant a motion for mistrial. *Luvene*, 127 Wn.2d at 707.

*Jury Instruction 20*

The second and related argument follows the trial court's refusal to give Intex's proposed instruction 20:

> Defendant Intex's knowledge, or lack thereof, of any alleged danger in the use of its product is not relevant to the question of whether the product was not reasonably safe as designed.

CP at 850.

■ ■ The number and wording of instructions is a matter also addressed to the discretion of the trial judge. *Douglas v. Freeman*, 117 Wn.2d 242, 256, 814 P.2d 1160 (1991). And here the judge instructed the jury fully and quite specifically on the plaintiffs' burden of proof. Instruction 18 said the plaintiffs had the burden of proving that Intex supplied a product that was not reasonably safe as designed. CP at 3286. Instruction 19 set out the risk-utility and consumer-expectation tests for determining whether a product is not reasonably safe as designed. CP at 3287.

So, then, to instruct that Intex's knowledge was irrelevant on whether this product was reasonably safe would confuse the jury. The information was relevant. How can a manufacturer evaluate the risk side of the risk-utility test without knowledge of risks posed by the product? The standard is strict liability and not negligence. But the

problem of design defect implicates a strict liability standard that is "negligence-like." *Falk*, 113 Wn.2d at 653. A manufacturer's knowledge of the risk is not a prerequisite to strict liability, but it is relevant to risk-utility.

Therefore, the court correctly ruled that the evidence was relevant. We conclude, then, that the trial judge did not abuse her discretion by refusing Intex's proposed instruction on knowledge. The instructions given allowed the parties to argue their theories of the case.

Mr. Higgins's Assumption of Risk or Comparative Negligence

Mr. Higgins moved to strike Intex's affirmative defenses that he assumed the risk and that he was comparatively negligent by making this rescue effort. The trial judge agreed and struck those defenses. Intex argues that the propriety of Mr. Higgins's actions is for the jury, notwithstanding the rescue doctrine.

■ The question is whether, as a matter of fact, there was a reasonably safe alternative for the rescue. *Knudsen v. Merle Hay Plaza, Inc.*, 160 N.W.2d 279, 284 (Iowa 1968). But comparative negligence and assumption of risk do not apply when the rescuer acts neither rashly nor recklessly. *McCoy v. Am. Suzuki Motor Corp.*, 136 Wn.2d 350, 355, 961 P.2d 952 (1998).

■ Here, the superior court observed that "[e]ither Mr. Higgins was going to rescue him or he wasn't. That was about the only decision making that could go on at that point so . . . there is no basis for assailing the method." RP at 71-72. He had no time to decide whether he could lift Kyle out of the way or if pushing him while keeping himself out of the Sno-Tube's path was the best rescue method. There was no reasonably safe alternative open. Reasonable minds could not differ on this. The court then properly determined as a matter of law that Mr. Higgins did not assume the risk inherent in the rescue situation or act in a negligent manner. *See Yurkovich v. Rose*, 68 Wn. App. 643, 652, 847 P.2d 925 (1993).

Instruction on Joint and Several Liability

If the plaintiff is fault free, then the defendants against whom judgment is entered are jointly and severally liable for the sum of the damages awarded by the jury. RCW 4.22.070(1)(b). Intex wanted the court to tell the jury this:

> it is appropriate to advise the jury of the consequences of their action under a legal framework. . . . [T]he [Washington Pattern Jury Instructions] for example, automatically tell the jury of the consequences of comparative negligence, that there will be a reduction in the verdict . . . . [Therefore,] it is appropriate [for the jury] to be told that the consequences of even finding one percent against the Defendant could result in their being responsible for the whole thing.

RP at 2392-93. The judge refused. Intex relies on cases from several states that allow jury instructions on the effect of joint and several liability.[1]

■ ■ Again, the standard of review here is abuse of discretion. *Douglas*, 117 Wn.2d at 256. And the question is whether the judge had to give this instruction—whether she abused her discretion by refusing the instruction. Neither the legislature nor the courts require such an instruction. The trial court must instruct in a manner that allows each party to argue its theory of the case. *Farm Crop Energy, Inc. v. Old Nat'l Bank of Wash.*, 109 Wn.2d 923, 933, 750 P.2d 231 (1988). But the trial court has the discretion to decide the number and specific language of the instructions it will use to achieve this purpose. *Douglas*, 117 Wn.2d at 256. The absence of this instruction did not, in any way, impair Intex's ability to argue its theory of the case—no design defect. It simply precluded argument on who pays the judgment. That is not an abuse of discretion. *Id.*

---

[1] *See, e.g., Luna v. Shockey Sheet Metal & Welding Co.*, 113 Idaho 193, 195-96, 743 P.2d 61 (1987); *DeCelles v. Mont. Dep't of Highways*, 243 Mont. 422, 795 P.2d 419 (1990). *See also* Elliot Talenfeld, *Instructing the Jury as to the Effect of Joint and Several Liability: Time for the Court to Address the Issue on the Merits*, 20 Ariz. St. L.J. 925, 930-37, 941-42 (1988); Julie K. Weaver, Comment, *Jury Instructions on Joint and Several Liability in Washington State*, 67 Wash. L. Rev. 457, 474 (1992).

USE OF INTEX EXPERT BRETTING'S DEPOSITION

The deposition of an expert witness may be used as follows:

> (A) The discovery deposition of an opposing party's rule 26(b)(5) expert witness, who resides outside the state of Washington, may be used if reasonable notice *before* the trial date is provided to all parties and any party against whom the deposition is intended to be used is given a reasonable opportunity to depose the expert again.

CR 32(a)(5)(A) (emphasis added). The question here turns on the permissible use of an opponent's expert witness.

 Intex listed Gerald Bretting in the trial management joint report as an expert it would call. CP at 3513. And near the end of the trial, at the behest of the trial judge, Intex listed remaining witnesses, including Mr. Bretting. But Intex rested its case without calling Mr. Bretting. The plaintiffs then asked the court to allow them to read portions of Mr. Bretting's deposition. The court permitted them to do so.

Intex argues that the plaintiffs did not give the reasonable notice required by CR 32 that they would use Mr. Bretting's deposition. The plaintiffs respond that Intex represented to them and the court, as late as the weekend before it rested, that it planned to call Mr. Bretting. The plaintiffs had, then, no opportunity to give Intex notice "before the trial date" that they intended to use the Bretting deposition. CR 32(a)(5)(A).

First, this is another decision vested in the discretion of the trial court. *Hendrickson v. King County*, 101 Wn. App. 258, 265, 2 P.3d 1006 (2000). In *Hendrickson*, Division Two of this court concluded that the trial judge had not abused his discretion when he prohibited use of depositions at trial, given the short notice. *Id.* at 265-66.

But in *Hendrickson*, the plaintiffs did not list one of the experts as a witness at all and had listed another as only a possible trial witness. One month before trial, the plaintiffs filed a witness list that did not include either expert. Only

then did the county notify the plaintiffs of its intent to use both experts' depositions. The court concluded this notice came too late. Division Two concluded there was no abuse of discretion. *Id.*

Here, Intex listed Mr. Bretting as a trial witness and represented during its case that it intended to call him. The plaintiffs wanted to elicit important information from Mr. Bretting. Without the use of his deposition they would be denied that opportunity. Those are tenable grounds for the trial judge doing what she did here. *See Hill v. Cox*, 110 Wn. App. 394, 409, 41 P.3d 495 ("A court abuses its discretion when no tenable grounds exist for its decision."), *review denied*, 147 Wn.2d 1024 (2002). We find then no abuse of discretion. *See Hendrickson*, 101 Wn. App. at 265.

INCONSISTENT VERDICTS

Intex next argues that the jury's failure to find Dan Falkner negligent is inconsistent with its finding that the Sno-Tube was unreasonably dangerous.

■■■ "The elements of negligence are duty, breach, causation, and injury." *Keller v. City of Spokane*, 146 Wn.2d 237, 242, 44 P.3d 845 (2002). "Whether the defendant owed the plaintiff a duty . . . turns on the foreseeability of the injury . . . ." *Rasmussen v. Bendotti*, 107 Wn. App. 947, 956, 29 P.3d 56 (2001). That is, " '[t]he hazard that brought about . . . the result must be among the hazards to be perceived reasonably and with respect to which defendant's conduct was negligent.' " *Id.* (quoting *Rikstad v. Holmberg*, 76 Wn.2d 265, 268, 456 P.2d 355 (1969)).

Here, the evidence included Dan Falkner's testimony that the accident occurred on his second run with his new Sno-Tube. And on his first run the Sno-Tube had not rotated him backward. But it did rotate him backward on his second run. And this prevented him from seeing what was in his path and foreclosed any opportunity for evasive action. Based on this testimony, the jury could find that the hazard—not being able to see persons or obstacles in his path—was not one reasonably anticipated by Mr. Falkner

when he made his second run down the hill. He could not reasonably foresee the hazard. And so he was not under a duty to prevent it. And he was, therefore, not negligent. These findings are not inconsistent with the jury's finding that the tube was not reasonably safe as designed and, implicitly, that the design caused this injury, not Mr. Falkner's action or inaction.

STEPCHILD'S CLAIM FOR LOSS OF CONSORTIUM

Finally, Intex contends that the legislature has not provided for a loss of consortium claim by a stepchild. It did provide for a similar claim in the wrongful death and survival statutes. *See Klossner v. San Juan County*, 93 Wn.2d 42, 47, 605 P.2d 330 (1980); RCW 4.20.020, .060. Intex argues the trial court therefore erred by instructing on this claim and allowing the jury to make an award for this loss.

■ Our review of this question is de novo. *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 813, 854 P.2d 1072 (1993).

■ ■ "In the parent-child relationship the term consortium refers to the 'loss of a parent's love, care, companionship and guidance ....'" *Ueland v. Pengo Hydra-Pull Corp.*, 103 Wn.2d 131, 132 n.1, 691 P.2d 190 (1984) (quoting David P. Dwork, Note, *The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused by Tortious Injury to the Parent*, 56 B.U. L. REV. 722, 723 (1976)). In *Ueland*, the Washington Supreme Court extended the common law to allow an action for loss of parental consortium. *Id.* at 140. In doing so, the court rejected the defendants' contention that creation of such a cause of action is for the legislature, not the court. *Id.* at 136. It cited as authority its decision in *Lundgren v. Whitney's, Inc.*, where the court held a woman has an action for loss of consortium when her husband is negligently injured. *Lundgren v. Whitney's, Inc.*, 94 Wn.2d 91, 614 P.2d 1272 (1980). The defendants there argued that changes in the common law rule on loss of consortium are better left to the legislature. The court rejected that argu-

ment: "this contention is in effect 'a request that courts abdicate their responsibility for the upkeep of the common law.' " *Id.* at 95 (quoting *Rodriguez v. Bethlehem Steel Corp.*, 12 Cal. 3d 382, 393, 525 P.2d 669, 115 Cal. Rptr. 765 (1974)).

So the novel question before us is whether an action for loss of parental consortium extends to stepchildren. We can find no appellate decision precisely on point. *See* 1 JACOB A. STEIN, STEIN ON PERSONAL INJURY DAMAGES § 2:22, at 2-70 (3d ed. 1997 & Supp. 2003). And the cases cited by Intex are distinguishable.

In *Versland v. Caron Transport*, the Montana court held that stepchildren of a deceased stepparent had no action for loss of parental consortium. *Versland v. Caron Transp.*, 206 Mont. 313, 671 P.2d 583 (1983). But, the issue framed by the court there was whether the nonadopted minor children had a claim for loss of consortium under the Montana wrongful death statute. *Id.* at 323. The court relied on the language of its state statute—that only the "heirs or personal representative" of the deceased person may sue for wrongful death—in holding that stepchildren, not being heirs, are not entitled to bring a claim for loss of consortium. *Id.* The comparable Washington statute provides that stepchildren may bring an action for wrongful death. RCW 4.20.020.

In *Mendoza v. B.L.H. Electronics*, the court held that an *adult* stepchild could not recover for loss of parental consortium. *Mendoza v. B.L.H. Elecs.*, 403 Mass. 437, 530 N.E.2d 349 (1988). It reasoned that the plaintiff lacked a legal relationship to the injured party or any "unique and intense dependency" with the injured party. *Id.* at 438. A concurring opinion also cited the state's wrongful death statute, which, unlike Washington's, does *not* allow a stepchild to recover for the death of a stepparent. *Id.* at 440 (Liacos, J., concurring).

In *Ford Motor Co. v. Miles*, the stepchild was injured and his *stepfather* and sibling sought damages for loss of consortium. *Ford Motor Co. v. Miles*, 967 S.W.2d 377 (Tex. 1998). The court held that neither had such a cause of

action. *Id.* at 383-84. Texas had previously recognized an action for loss of parental consortium. *Id.* at 383 (citing *Reagan v. Vaughn*, 804 S.W.2d 463, 465-66 (Tex. 1990)). The court noted that the decision in *Reagan* was consistent with the Texas wrongful death statute which limits recovery to the spouse, children, and parents of the deceased. *Id.* The court stated, "it would be anomalous to recognize a cause of action for loss of consortium for a severe injury to a loved one when there is no recovery for the death of that same family member." *Id.* The court recognized that the policy decisions of the legislature did not bind it. But it nevertheless cited the boundaries established by the legislature as "inform[ing its] decision" under the common law. *Id.*

■■■ We conclude then that the question of who has a common law consortium claim is properly influenced by wrongful death statutes. Here, the Washington wrongful death statute allows claims by stepchildren. RCW 4.20.020. We then recognize a claim for loss of parental consortium by a stepchild.

Mr. Higgins's stepson, Boyd Parker, was dependent upon him for support. Indeed, Mr. Higgins had a legal obligation to support Boyd. *See State v. Gillaspie*, 8 Wn. App. 560, 562, 507 P.2d 1223 (1973). Under the wrongful death statute, Boyd would have had a claim. The effect here is the same. The stepchild dependent on the support is denied that support through the wrongful acts of the defendants.

We affirm the judgment.

SCHULTHEIS and KURTZ, JJ., concur.

Reconsideration denied December 6, 2004.